## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
| | : | |
| v. | : | |
| | : | |
| WILLIE HINES | : | NO.  08-185-1 |

## MEMORANDUM AND ORDER

**Gene E.K. Pratter, J.**_____**March 3, 2009**

Willie Hines, charged by way of an indictment with one count of violating 18 U.S.C. §
922(g)(1) (possession of a firearm by a convicted felon), moves the Court to suppress certain
physical evidence, most notably the firearm cited in the indictment, seized attendant to his arrest
on November 21, 2006.  With the benefit of thorough briefing by counsel for Mr. Hines and
counsel for the Government, as well as an evidentiary hearing, the Court denies the motion for
the reasons summarized below.

## FACTUAL BACKGROUND

Two Philadelphia law enforcement officers, Lt. David Marnien and Warrant Officer
William Johnson, testified at the suppression hearing and described the following scenario.

At approximately 3:40 a.m. on November 21, 2006, Lt. Marnien was driving a marked
police car, approaching the intersection of Darrah and Margaret Streets, when he saw several
warrant officers engaged in certain activities on the side of the road.  When Lt. Marnien stopped
his car on Darrah Street (a one-way road that has but a single traffic lane) to inquire as to whether

he could be of assistance, he effectively blocked car passage on Darrah.  Soon, a red 2006 Dodge

Magnum drove up behind Lt. Marnien's stopped police car.  Mr. Hines was a passenger in the

back seat of the Magnum, Duane Spiller was the driver and George Hancock was the front seat

passenger.  Lt. Marnien believed he recognized the Magnum as a car he had observed more than

once driving around the neighborhood within a short time prior to these events on Darrah Street.

The Dodge Magnum had committed no traffic violations, and the prior observations had not

engendered any investigatory effort on Lt. Marnien's part.

     Warrant Officer Johnson, driving an unmarked S.U.V. to the same intersection, observed

the Dodge Magnum pull up and stop behind Lt. Marnien's police car.  Officer Johnson initially

stopped his car approximately 20 feet behind the Dodge Magnum and, apparently realizing that

the civilian car would be effectively hemmed in by the two officers' cars, then moved his S.U.V.

over closer to the edge of the street to allow the Dodge Magnum to back out of the street.  When

the civilian car made no move, Officer Johnson flashed his headlights, intending to thereby

signal to the "pinned" Magnum that the civilian driver could back up and away from the police

car and be on its way.  Silence and non-movement was the response from the Dodge Magnum.

     At this point, Lt. Marnien got out of his car and walked toward the driver's side of the

Magnum.  Seeing this, Officer Johnson pulled away from the edge of the curb and placed his car

closer to and directly behind the Dodge Magnum.  He also turned on his flashing lights,

signifying that he was a law enforcement officer.

     Lt. Marnien (who was in a police uniform) walked to the driver side of the Dodge, and

Officer Johnson (who was wearing a clearly marked "Warrant Unit" vest and had his badge

hanging from around his neck) headed to the passenger side.  Lt. Marnien intended to inquire

where the occupants of the Dodge were going at this hour, especially given the problematic

nature of the neighborhood.  The Dodge's engine and lights remained on.  As they approached

the Dodge, both Lt. Marnien and Officer Johnson saw the back seat passenger, Mr. Hines,

"slouch down."  Lt. Marnien also described seeing Mr. Hines contemporaneously drop his right

shoulder.  Lt. Marnien asked the occupants of the Dodge several questions, including where they

were coming from.  He testified that the driver replied that they were coming from a girl's house.

He also testified that none of the men in the car answered his follow-up questions concerning the

girl's name or the address of her house.  He also then determined that none of the three men were

from the immediate neighborhood locale.  Officer Johnson asked no questions and made no

comment.  The officers maintain that their interaction with the three men up through this point

was entirely non-confrontational, non-threatening and conversational, without any verbal or non-

verbal reference to their weapons, handcuffs or the like.

Mr. Hines argues that the three civilians were "literally trapped at this point" and "had no

choice but to remain and talk to the officers."  Talk they did.  Most notably, apparently

unprompted, Mr. Hines volunteered that he had been shot in the foot earlier that evening.  Lt.

Marnien overheard this statement and, knowing from his review of reports at the start of his shift

of an earlier shooting in the neighborhood, confirmed by radio those reports of a shooting of

Willie Hines some five hours earlier a few blocks away.  At this point and with this confirmation,

Lt. Marnien directed the three men to get out of the car.  Lt. Marnien testified that his 26 years'

police experience and his knowledge of the neighborhood prompted him to collate mentally all

3

the now-available information[1] to indicate to him that the three men could be seeking to retaliate for Mr. Hines' having been shot.

The officers conducted officer-safety frisks of the three men.  None was armed.  Officer Johnson conducted a visual inspection of the interior of the car by shining his flashlight into the backseat via the still-open rear passenger door from which Mr. Hines had gotten out of the car.

He saw a handgun on the floor below the front passenger seat.  Officer Johnson announced the presence of a firearm, and Mr. Hines and his companions were immediately placed on the ground, searched again and restrained.  Officer Johnson retrieved the weapon, a Kimber .45 caliber semi-automatic handgun, serial number KU31398, loaded with seven live rounds.  According to the police witnesses, based upon the positioning of the gun in the car, it appeared to them that the gun had been placed on the floor under the front passenger seat from the backseat, specifically from the area where Mr. Hines had slouched down and leaned earlier.  Mr. Hines was arrested for possession of this gun and eventually indicted as described above.

Mr. Hines now contends that Lt. Marnien seized Mr. Hines for purposes of Fourth Amendment analysis the moment the Lieutenant approached the Dodge, "without reasonable suspicion to do so, and began subjecting him to a Terry-type inquiry."  More specifically, the defense argues that the seizure of Mr. Hines was without probable cause or reasonable suspicion and, therefore, "invalidates the seizure of any evidence acquired as an immediate and proximate

---

[1]Lt. Marnien enumerated the following information that he considered germane: 1) his having seen previously the Dodge Magnum driving around the neighborhood; 2) the late hour; 3) the fact that none of the three men lived in the neighborhood; 4) Mr. Hines had been shot near-by several hours earlier; 5) Mr. Hines' possibly furtive body movement in the back of the car upon the officers' approach; and 6) none of the three men could or would provide any identifying information about the girl they said they had been visiting.

result of that arrest as 'fruit of the poisonous tree.'" Mr. Hines maintains that "but for the illegal action of the police...evidence of the firearm would not have come to light."


## LEGAL DISCUSSION

The Supreme Court's <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), decision holds that brief investigative stops by the police are Fourth Amendment "seizures" and, therefore, cannot pass constitutional muster if they are "unreasonable." Thus, law enforcement personnel are put to the task of "point[ing] to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>Id.</u> at 21. Both Mr. Hines and the Government acknowledge that under <u>Terry</u>, a person is "seized" when "taking into account all of the circumstances surrounding the encounter, the police conduct would - - 'communicate [ ] to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" <u>Johnson v. Campbell</u>, 332 F.3d 199, 205 (3d Cir. 2003) (quoting <u>Kaupp v. Texas</u>, 538 U.S. 626, 123 S. Ct. 1843, 1845 (2003); <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991)). As is often the case, the challenges in applying this standard require reconciling competing arguments as to what circumstances to focus on and through whose perspective should the prism of those circumstances be viewed.

The Government contends that the officers' "[i]ntent is the most crucial 'circumstance' surrounding the encounter," and points to Lt. Marnien's testimony that he did not intend to stop the Dodge Magnum by stopping his own police car on Darrah Street but rather had only intended to offer assistance to the warrant officers working nearby. The Government sensibly observes that Lt. Marnien did not know and could not have known that Mr. Hines and his companions

would drive down Darrah Street behind him.  To support the focus on Lt. Marnien's benign intent the Government cites Brower v. County of Inyo, 489 U.S. 593 (1989), and County of Sacramento v. Lewis, 523 U.S. 833 (1998), cases that unequivocally concentrate on the officers' specific intent.

Mr. Hines, however, urges the Court to consider the circumstances from his perspective by arguing that a "seizure occurs when there is either (a) 'a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful,' or (b) submission to 'a show of authority.'" United States v. Brown, 448 F.3d 239, 245 (3d Cir. 2006) (quoting California v. Hodari D., 499 U.S. 621, 626 (1991)).  The "show of authority" test "is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person."  Id.

No case law, and no interpretation of the facts here would support a finding that the occupants of the Dodge Magnum were "seized" at the moment when its forward movement on Darrah Street was blocked by Lt. Marnien's police car.  The next developments in this scenario were Lt. Marnien's walking up to and making inquiries to the occupants of the Dodge Magnum and Officer Johnson's arrival.

A Fourth Amendment seizure does not occur every time a law enforcement officer approaches someone to make inquiries without any attendant show of force.  Considered "consensual encounters," this conduct is an "important tool[ ] of law enforcement and need not be based on any suspicion of wrongdoing." Johnson, 332 F.3d at 205 (quoting Bostick, 501 U.S. at 434).  Here, Lt. Marnien made certain, common sense introductory inquiries of the three men in the Dodge Magnum, i.e., where had they come from and where were they going.  He gave no

directive or command to them; he spoke in a conversational tone; he exhibited no show of force such as by calling attention to his gun or other equipment.  Indeed, a "show of force" would require something more than merely a police vehicle and a police uniform in order to conjure in the mind of a reasonable person that a seizure is taking place.  Even the arrival and presence of the second officer, Officer Johnson, does not add to a sense of intimidation or law enforcement show of force, given that his arrival on the scene was essentially serendipitous and accompanied initially by his efforts to move his vehicle out of the way to facilitate the Dodge Magnum's departure from the site.  That Mr. Hines and his colleagues chose not to leave at that point does not change the character of the officers' conduct to be coercive vis á vis the civilians.

Upon close consideration, the Court concludes that the seizure of Mr. Hines occurred after Lt. Marnien's suspicions had been raised by Mr. Hines having volunteered that he had been shot earlier that same night.  It was entirely appropriate that the Lieutenant's suspicions should have been raised then, and it is of no moment that it was legal activity that did so because "[a] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." United States v. Ubiles, 224 F.3d 213, 217 (3d Cir. 2000).  See also, Johnson, 332 F.3d at 207. Here, Lt. Marnien sensibly became concerned on the basis of his professional experience and the transpiring events that "criminal activity may be afoot," Terry, 392 U.S. at 22, and that Mr. Hines and his two companions could be seeking retaliation for his having been shot.  United States v. Arvizu, 534 U.S. 266 (2002); United States v. Cortez, 449 U.S. 411, 418 (1981).

The raising of Lt. Marnien's suspicion was quickly followed by his having the driver and passengers get out of the Dodge Magnum.  No violation of the Fourth Amendment occurred. Maryland v. Wilson, 519 U.S. 408, 415 (1997); Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6

7

(1977).  At the point the three men were instructed to get out of the car, with Lt. Marnien intending to frisk them for officer safety, they were "seized" in accordance with the officer's reasonable suspicions prompted by the totality of the circumstances as presented.  Arvizu, 534 U.S. at 277.  Given all that Lt. Marnien knew about the circumstances, the police were justified in frisking them in order to guard against the possibility that they were "dealing with an armed and dangerous individual."  Terry, 392 U.S. at 27.  There was no impropriety in the frisks.

Likewise, under the circumstances extant, a limited visual search of the car for weapons was permissible.  Michigan v. Long, 463 U.S. 1032, 1049 (1983).  A search of the backseat was particularly justified in this instance, given that both Lt. Marnien and Officer Johnson saw Mr. Hines "slouch down" in the backseat as Lt. Marnien approached the Dodge, and it was reasonable for the police to be concerned that Mr. Hines could have been secreting a weapon or contraband.  Indeed, Officer Johnson's search was cursory only, and, because the seized gun was in plain view once the officer, who was present lawfully, shone his flashlight into the backseat floor, no unlawful seizure took place.  See Horton v. California, 496 U.S. 128, 136 (1990).

Therefore, because at each step of the encounter between Mr. Hines and the law enforcement officers in the early morning hours of November 21, 2006, the seizure of the

Kimber .45 caliber semi-automatic handgun was lawful.  It will not be kept from being

introduced into evidence at trial.


                                                BY THE COURT:


                                                   /s/ Gene E.K. Pratter
                                              GENE E.K. PRATTER
                                              United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**


| UNITED STATES OF AMERICA | : | CRIMINAL ACTION |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| WILLIE HINES | : | NO. 08-185-1 |


## <u>O R D E R</u>

AND NOW, this 3rd day of March, 2009, upon consideration of the Motion of Willie

Hines to Suppress Physical Evidence (Docket No. 19) and the government's Response to the

motion (Docket No. 21), for the reasons set forth in the accompanying Memorandum, the Motion

is **DENIED**.


BY THE COURT:


  /s/ Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge